UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,                          Case No. 10-20717

                   Plaintiff,                      Honorable Sean F. Cox
                                                   United States District Judge
v.

D-1 Dainius Vysniuaskus,
D-2 Tatsiana Leichanka,

                   Defendants.
_____/

## ORDER REGARDING SENTENCING GUIDELINES

Defendants Danius Vysniauskus ("Vysniauskus") (D-1) and Tatsiana Leichanka

("Leichanka") (D-2) pleaded guilty to bank fraud, attempted bank fraud, and conspiracy to

commit bank fraud. Defendants pleaded guilty without the benefit of a Rule 11 Plea Agreement.

The Probation Office prepared Presentence Investigation Reports ("PSR"), computing a base

offense level of 7 for both Defendants and assessing various offense level enhancements. In their

sentencing memoranda, Defendants objected to the following sentence enhancements assessed by

the Probation Office: (1) a 12-level adjustment for an amount of loss between $200,000 and

$400,000, pursuant to § 2B1.1(b)(1)(G); (2) a 2-level adjustment for obstruction of justice,

pursuant to § 3C1.1(A) and (B)(I); and (3) a 2-level adjustment for an offense involving

sophisticated means, pursuant to § 2B1.1(b)(a)(C). Vysniauskus also objects to an enhancement

for an aggravating role through his alleged organization, management and control of his co-

defendant.

On September 28, 2011, this Court held a status conference to discuss Defendants'

1

objections.  On October 26, 2011, the Court held an evidentiary hearing, limited to the sentence enhancements assessed for the amount of loss and obstruction of justice.  For the reasons stated below, the Court finds that Defendant Vysniauskus's offense level under the Guidelines is 23, and Defendant Leichanka's offense level under the Guidelines is 21.

## DISCUSSION

"When a district court relies on its own findings of fact in calculating a Guidelines range, it must base its findings on reliable information and a preponderance of the evidence." *United States v. Stokes*, 392 Fed.Appx. 362, 369 (6th Cir.2010).  This means that a district court, after sitting as the trier of fact, "believe[s] that the existence of a fact is more probable than its nonexistence...." *In re Winship*, 397 U.S. 358, 371–72 (1970).  Applying the preponderance of the evidence standard, it is the Government's burden to prove certain necessary facts at sentencing.  *U.S. v. Jackson*, 990 F.2d 251, 253 (6th Cir.1993).

## EVIDENTIARY HEARING

Vysniauskus filed his sentencing memorandum on September 22, 2011, and Leichanka filed her sentencing memorandum one day later.  On October 5, 2010, the Government filed its sentencing memorandum, in which it recommended that the Court apply the following offense levels to Defendants:

Total as to Dainius Vysniauskas

| | |
|---|---|
| Base Offense (§ 2B1.1(a)(1)(A) and (B)) | 7 |
| Amount of Loss $120,000 - $200,000 (§ 2B1.1(b)(1)(G)) | 10 |
| 10+ victims (§ 2B1.1(b)(2)(A)(1)) | 2 |
| Sophisticated means (§ 2B1.1(b)(9)(c)) | 2 |
| Unlawful production of identification (§ § 2B1.1(b)(10)(C)(i and ii) | 2 |
| Obstruction of justice (§3C1.1(A and B)) | 2 |
| Aggravating role (§ 3B1.1(c)) | 2 |

**Total Offense Level:** 27

Total as to Tatsiana Leichanka

| | |
|---|---|
| Base Offense (§ 2B1.1(a)(1)(A) and (B)) | 7 |
| Amount of Loss $120,000 - $200,000 (§ 2B1.1(b)(1)(G)) | 10 |
| 10+ victims (§ 2B1.1(b)(2)(A)(1)) | 2 |
| Sophisticated means (§ 2B1.1(b)(9)(c)) | 2 |
| Unlawful production of identification (§ § 2B1.1(b)(10)(C)(i and ii) | 2 |
| Obstruction of justice (§3C1.1(A and B)) | 2 |

**Total Offense Level:** 25

At October 26, 2011 evidentiary hearing, the Government called Lt. Robert Shelide of the Southfield Police Department and Special Agent Neil Gavin of the F.B.I.. The Court also admitted 36 exhibits.

On October 27, 2011, Vysniauskus filed a supplemental sentencing memoranda (D-1 Supp. Memo, Docket Entry No. 54) in support of his position with regard to his offense level, and challenging the sufficiency of the evidence presented by the Government. Similarly, on October 28, 2011, Leichanka filed her supplemental sentencing memoranda (D-2 Supp. Memo, Docket Entry No. 57) discussing the same.

The Government also filed a supplemental sentencing memorandum (Gov. Supp. Memo, Docket Entry No. 56) in support of its position with respect to the applicability of the guideline enhancements.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the exhibits submitted by the parties, having considered the arguments presented by counsel, and having applied the governing

legal principles, the Court makes the following findings of fact and conclusions of law.[1]

FINDINGS OF FACT

Neither Defendant is a citizen of the United States. Vysniauskus, originally from Lithuania, illegally entered the United States in 1999. He has a history of criminal conduct and failing to appear for hearings after posting bond. In 2006, he was deported after being arrested for his connection with a group involved in obtaining fraudulent Michigan identification cards. In September 2007, he illegally re-entered the United States through Mexico.

Leichanka has illegally remained in the United States after her 90-day student visa expired in 2004. In 2007, Leichanka moved from Wisconsin to Michigan to begin a relationship with Vysniauskus. The two have a son together, who was born on December 21, 2008.

Defendants do not dispute facts that led to Defendants' current charges. On April 20, 2010, Defendants drove to a Chase Bank branch in Sterling Heights, Michigan. Leichanka attempted to open a bank account under a false name, but fled the bank after the teller became suspicious of her false identification and a report of an account being opened at a different branch the previous day. Sterling Heights police officers arrested Defendants as they attempted to exit the bank parking lot. Upon arrest, both Defendants provided the officers with false names and denied the existence of any children.

While jailed at the Sterling Heights Police Department, Vysniauskus placed two telephone calls to a friend, Vytas, that were recorded and subsequently translated from Lithuanian to English. In the phone calls, Vysniauskus tells Vytas to break into Defendants'

---

[1]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

4

Southfield, Michigan apartment, take Defendants' 16-month-old son, who they had left alone in the apartment, and also to remove any evidence of fraudulent activity.

In the late hours of April 21, 2010, almost two days after Defendants' had been arrested, Lt. Robert Shelide, of the Southfield Police Department received a call about a child left unattended in Defendants' apartment. Lt. Shelide received instructions to meet three individuals at a Southfield restaurant. The three individuals offered to lead Lt. Shelide to Defendants' apartment so that officers could retrieve the child. Lt. Shelide, along with other officers, gained entry into the apartment. The officers found the baby alone in the apartment, sleeping face-down on a bed in a bedroom. While in the apartment, upon casual inspection, the officers noticed a number of check boxes, piles of mail addressed to numerous individuals, and computer equipment.

Southfield officers subsequently obtained a search warrant for the apartment. While searching the apartment, officers found hundreds of bank checkbooks, bank cards, credit cards, stolen mail, false identification documents bearing the Defendants' pictures, mail addressed to Defendants' alias names, computer equipment, cell phones, and $2,900 in cash. The items confiscated by Southfield Police officers from Defendants' apartment include:

- 103 financial devices consisting of check cards, credit cards, gift cards, and preferred customer cards. (76 bearing male names, 15 bearing female names, 4 gender-neutral access devices, and 8 pin number access codes) (Gov. Exs. 25, 27);

- Mail addressed to various individuals, numerous identification documents, international driver's license documents, federal social security documents, and state identifications associated with the documents (Gov. Ex. 28);

- Two notebooks containing names of various individuals, dates of birth, social security numbers, and addresses (Gov. Exs. 29, 30);

- A treasury check payable to a person named Jeudy Trot (Gov. Ex. 27);

- Numerous sets of checks (Gov. Exs. 32- 35);

- Identification of Anthony Demaree, an individual who lived in Defendants' apartment complex (Gov. Ex. 37);

- Computers and other electronics.

The Southfield Police Department transferred all the items seized from Defendants' home to FBI Agent Gavin. Agent Gavin subpoenaed records from various banks with which Defendants' were suspected of having fraudulent bank accounts and his investigation revealed that they used a number of different financial institutions in a scheme to defraud. (Gov. Ex. 8). Defendants, often using false identities, conducted transactions from over 100 checking, savings, or credit accounts from these banks. In total, while floating funds between their various accounts, Defendants deposited $230,216.56 and withdrew $237,998.48 from October 2008 to March 2011. (*Id.*). Defendants manipulated their accounts such that they would rely on their accounts' "overdraft protection" by withdrawing cash in excess of available funds, moving funds between accounts, and extracting small amounts of cash during deposit delays. These transactions include $44,250 worth of returned checks or deposits associated with Defendants' failed attempts to negotiate checks through fraudulently created accounts. (*Id.*)

In addition to a number of transactions in which they used fake aliases, Defendants also used the identity of at least two real individuals in certain banking transactions. Vysniauskus opened a Bank of America account in the name of Anthony Demaree, an individual who lived in the same apartment complex as Defendants, and also created a fraudulent New York identification card bearing Mr. Demaree's name, but with the image of Vysniauskus. (Gov. Ex.

37).  Agent Gavin interviewed Mr. Demaree, who reported that while living in the same apartment complex as Defendants, the complex's mail receptacle for each apartment was outdoors and accessible to anyone.  Additionally, Mr. Demaree reported $186.35 in unauthorized charges on his VISA credit card.  (Gov. Ex. 12).  Similarly, Leichanka used the identity of a real individual, Maria Babanina, to open a Bank of America checking account.  (Gov. Ex. 8).  Among the items seized from Defendants' apartment was a an identification document bearing the name Maria Babanina, but a picture of Leichanka.

Furthermore, on June 24, 2008, the Oakland County Sheriff's Office initiated an investigation after a Costco store reported that Vysniauskus, using the alias Eduardos Zenkevicius, issued non-sufficient funded checks to Costco for $5,657.06.  (Gov. Ex. 16).  The checks were drawn upon a fraudulently created account with Comerica Bank.  (*Id.*).

During the course of its investigation, the FBI analyzed the computers seized from Defendants' apartment.  Among the data retrieved from the computer were several images of Defendants which appeared to have been scanned into the computer.  These images of Defendants were identical to those used in the fraudulent identification documents seized from Defendants' apartment.

On July 7, 2010, Defendants were charged and convicted of identity theft in Macomb County Circuit Court.  Both Defendants were sentenced to 78 days imprisonment.  Defendants were then indicted for bank fraud, attempted bank fraud, and conspiracy to commit bank fraud by a federal Grand Jury on November 20, 2010.  They pleaded guilty on April 12, 2011.

## CONCLUSIONS OF LAW

I.     <u>The Court Shall Assess a 10-Level Enhancement for an Amount of Loss Greater than</u>

$120,000.

The Probation Department determined the amount of loss resulting from Defendants' conduct is $289,498, and assessed a 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) for amount of loss between $200,000 and $400,000.

In determining the total loss attributable to Defendants, the Court must take the greater of the actual loss or intended loss. U.S.S.G. § 2B1.1, cmt. (n.3(a)). "[A]ctual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that was intended to result from the offense" and "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, cmt. n.2(A)(i) and (ii); *United States v. Triana*, 468 F.3d 308 (6th Cir.2006). It is appropriate to include completed intended loss in the total intentional loss calculation. *United States v. Tate,* 135 Fed.Appx. 821, 826 (6th Cir.2005); Unites *States v. Ware*, 334 Fed.Appx. 49 (8th Cir.2009).

Although the probation department calculated the total loss as $289,498, the Government contends that the total loss determinable by a preponderance of the evidence is $141,101.47, which results in a 10-level enhancement under 2B1.1(b)(1)(F) of the guidelines. The Government's submission of $141,101.47 total loss consists of:

- $51,500 in loss attributable to 103 financial transaction devices (each assessed a loss value of $500 under U.S.S.G. § 2B1 cmt. (n.3(F)(i)));

- $30,677.47 in loss reported by banks and an individual victim;

- $500.00 in actual loss associated with the theft of Anthony Demaree's identity;

- $44,250 in intended loss from returned checks and deposits;

- $8,517.00 in intended loss from disputed transaction claims;

•       $5,657.00 in losses associated with non-sufficient funds checks issued to Costco.

A.      <u>Actual Loss Associated with Financial Access Devices:</u>

The Government asserts that the loss associated with financial access devices totals $51,500.00.

Application Note 3(F)(i) of U.S.S.G. §2B.1.1, titled "Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes." provides, "In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device." U.S.S.G. §2B.1.1, cmt. n. 3(F)(i). Furthermore, 18 U.S.C. § 1029(e)(3) states that "the term 'unauthorized access device' means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud."

Here, the Government presented evidence of 103 credit cards, check cards, pin number access codes, gift cards, and access devices that were obtained with intent to defraud the financial institutions and individuals who were the victims of Defendants' fraudulent conduct. (*See* Gov. Ex. 8, 25, and 27). These access devices were confiscated from Defendants' apartment and subsequently linked by the FBI to dozens of bank accounts used in furtherance of Defendants' bank fraud scheme.[2]

After reviewing the evidence submitted by the Government and hearing the testimony of Agent Gavin, the Court finds that the Government has established by a preponderance of the

---

[2]The Government notes that 8 of these access devices bear the real names of either Vysniauskus and Leichanka. Nonetheless, the accounts associated with the access devices bearing Defendants' real names were still among the accounts used to facilitate Defendants' bank fraud scheme. Thus, the Court finds that these access devices were still obtained with intent to defraud. (*See* Gov. Ex. 8).

evidence that Defendants utilized 103 counterfeit or unauthorized access devices in furtherance

of their conspiracy to commit bank fraud.  At a minimum, Defendants used these access devices

in ATM transactions associated with almost every fraudulent account maintained by Defendants.

(*See* Gov. Ex. 8).  Pursuant to §2B.1.1, Application Note 3(F)(i), the Court shall assess a loss

value of $500 for each of the 103 access devices submitted by the Government.  Therefore, the

Court finds that the total loss value associated with the access devices is $51,500.

      B.      <u>Actual Loss Sustained by Financial Institutions and Individuals:</u>

The Government contends that it has proven, by a preponderance of the evidence, that the

actual loss sustained by the victims of Defendants' conspiracy is $31,177.47.  The Government

asserts that the victims that suffered actual loss as a result of Defendants' conduct include

National City Bank ($17,782.62), Charter One Bank ($9,307.28), Bank of America ($952.57),

Chase Bank ($2,454.00), TCF Bank ($181.00), and an individual, Anthony Demaree ($500).

The Court finds that the Government has sufficiently proven the actual loss sustained by

National City Bank, Charter One Bank, and Bank of America.  With regard to the actual loss

associated with these banks, the Government submitted an affidavit of loss signed by an agent for

each bank.  (Gov. Exs. 9-11).  The affidavits attest to the amount of actual loss associated with

the bank accounts that the FBI has linked to Defendants.[3]  Accordingly, the Court finds that the

---

[3]U.S.S.G. §2B1.1, Application Note 3(D)(ii) provides that loss shall not include
"[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon
return or rate of return, or other similar costs."  The amount of loss reported from Bank of
America does not include such fees or charges.  Moreover, the amounts of loss indicated in the
affidavits of National City and Charter One do not appear to include fees or charges because the
loss is the amount of restitution to which the banks are entitled. Nonetheless, "[t]he court need
only make a reasonable estimate of the loss."  U.S.S.G. §2B1.1, cmt. n. 3(c).  "The sentencing
judge is in a unique position to assess the evidence and estimate the loss based upon that
evidence. For this reason, the court's loss determination is entitled to appropriate deference."

Government has sufficiently established that National City Bank, Charter One Bank, and Bank of America actually lost a combined total of $28,042.47.

The Government, however, has not provided sufficient evidence to establish the actual loss associated with Chase Bank and TCF Bank. The Government relies solely on the Probation Office's determination that Chase Bank and TCF Bank lost $2,454.00 and $181.00, respectively. The Government has not submitted any evidence to support these loss totals, and the Court did not hear any testimony regarding these losses during the evidentiary hearing. As a result, the Court shall not attribute to Defendants the actual losses of Chase Bank and TCF Bank.

As stated above, the FBI determined that Vysniauskus used the identity of a former neighbor, Anthony Demaree, to open a bank account and make unauthorized transactions with Mr. Demaree's credit card. In support of these allegations, the Government submitted a New York State identification card bearing the name of Mr. Demaree and a photo of Vysniauskus (Gov's Ex. 36), records of a Bank of America account under Mr. Demaree's name traced to evidence seized from Defendants' apartment (Gov. Ex. 8), and Mr. Demaree's JP Morgan VISA account records which reflect $186.35 of unauthorized transactions (Gov. Ex. 12). Based upon this evidence, and the testimony of Agent Gavin, who interviewed Mr. Demaree regarding the unauthorized transactions, the Court finds that the loss suffered by Mr. Demaree is attributable to Defendants' conduct.

With regard to such unauthorized charges, "[i]n a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the

---

Therefore, based upon the evidence presented to the Court, the Court finds these affidavits to be sufficient to establish the amount of actual loss..

counterfeit access device or unauthorized access device and shall be not less than $500 per access device." U.S.S.G. §2B1.1, cmt. n. 3(F)(I). Although Defendants may have only made $186.35 in unauthorized purchases with Mr. Demaree's credit card or its access numbers, the sentencing guidelines require that the Court value the amount of actual loss at $500.

In summary, the Court finds that the amount of actual loss that the Government has proven is attributable to the fraudulent conduct of Defendants is $28,542.21. This amount consists of $28,042.27 in actual loss suffered by National City Bank, Charter One Bank, and Bank of America, and $500 in actual loss attributable to Defendants' theft of Mr. Demaree's VISA account number.

C.     Intended Loss:

The Government also asserts that it has proven, by a preponderance of the evidence, that Defendants intended, but did not succeed in defrauding financial institutions of an additional $58,424.00.

i.     Intended Loss From Failed Fraudulent Check Transactions:

In the Government's Exhibit 8, the Government provides a spreadsheet summary of all fraudulent accounts maintained by Defendants. Agent Gavin testified that he compiled this spreadsheet from more than 2,000 bank records associated with Defendants and obtained by the FBI. The spreadsheet also lists every returned check and returned deposit for each fraudulent account. The Government contends that the value of these failed attempts to negotiate a check through fraudulent accounts should be assessed by the Court as intended loss on the part of Defendants.

Application Note 3(A) to §2B1.1 states that, in calculating the amount of loss for

12

sentencing purposes, the "loss is the greater of actual loss or intended loss." It is appropriate to include completed intentional loss in the total intentional loss calculation. *United States v. Tate,* 135 Fed.Appx. 821, 826 (6th Cir.2005); Unites *States v. Ware*, 334 Fed.Appx. 49 (8th Cir.2009).

While the Sixth Circuit has not addressed the amount of intended loss in the type of fraudulent scheme at issue in this case, the Second and Tenth Circuits have previously held that the amount of intended loss in a check kiting scheme is equal to the amount of a defendant's overdrafts. *See United States v. Deutsch*, 987 F.2d 878 (2nd Cir.1993)*; United States v. Swanson*, 360 F.3d 1155, 1164 (10th Cir.2004). On the other hand, the Third Circuit Court of Appeals has held that, in bank fraud schemes such as the one at issue in this case, even though a defendant may not have actually succeeded in extracting funds from returned checks, the defendant intended on defrauding each bank by the face value of the checks. *See U.S. v. Geevers,* 226 F.3d 186 (3rd Cir.2000); *see also United States. v. Himler,* 355 F.3d 735, 741 (3rd Cir.2004) (face value of counterfeit checks is evidence of the amount of intended loss by defendant). Therefore, the Third Circuit determines the amount of intended loss by totaling the face value of the fraudulent checks.

The Court finds that the Third Circuit's method of calculating loss in these types of schemes, i.e. the face value of the fraudulent checks, is the more appropriate method of calculating loss under the Guidelines. Application Note 3(A)(ii) provides that intended loss "(I) means the pecuniary harm that was intended to result from the offense; and (II) *includes intended pecuniary harm that would have been impossible or unlikely to occur* (e.g., as in a government sting operation, *or an insurance fraud in which the claim exceeded the insured value*)." U.S.S.G. § 2B1 cmt. n. 3(A)(ii). Like a fraudulent insurance claim that exceeds the

insured value, a failed negotiated check from one fraudulent account to another is an attempt to extract funds in excess of funds actually found in the account from which the funds are drawn. Thus, Application Note 3(A)(ii) explicitly includes the type of intended harm Defendants contemplated in this case. Although it was impossible for Defendants to actually receive the face value of the fraudulent checks because of the balance in their fraudulent accounts, they nonetheless submitted the checks with the intention of defrauding the banks by these amounts.

In this case, the Government has sufficiently proven, through bank records and witness testimony, that Defendants attempted to defraud their victims by the face value of their returned fraudulent checks in the amount of $44,250.00. (*See* Gov. Ex. 8.).

In addition to the fraudulent checks summarized by the Government's Exhibit 8, the Government provided evidence to support that Vysniauskas, using the alias Eduardas Zenkevicius, issued non-sufficient funds checks to Costco in the amount of $5,657.06, to be drawn from a fraudulent account with Comerica Bank. The Oakland County Sheriff's Department issued a report regarding the non-sufficient funds checks to Costco on June 24, 2008. Agent Gavin testified that the Comerica Bank account from which the checks were written was one of Defendants' fraudulent checking accounts associated with the FBI investigation. Additionally, the alias used with regard to the Comerica account was the same alias that Vysniauskas used for other fraudulent accounts. The Court finds that Defendants intended to defraud Comerica Bank in an amount equal to the face value of the non-sufficient funds checks written to Costco. This additional amount increases Defendants intended loss associated with fraudulent checks to $49,907.06.

    ii.    <u>Intended Loss From Disputed Transactions:</u>

The Government asserts that Defendants also intended to defraud their victims in the amount of $8,517.00 by disputing credit or debit transactions they made through their fraudulent accounts. In support of this intended loss value, the Government submitted bank documents, obtained by Agent Gavin, which indicate that Defendants purchased items and subsequently disputed the transactions with the financial institutions. Defendants submitted claims to the banks, asserting that the transactions were the result of theft of their (fraudulently obtained) credit or check card. Agent Gavin also testified that the receipts for these purchases (Gov. Ex. 13) were among the documents seized from Defendants' apartment. The documentation from the banks reflects that Defendants disputed $8,517.00 worth of transactions. The Court finds that the Government has met its burden of proof and shall assess $8,517.00 of intended to loss to Defendants relating to Defendants' attempts to fraudulently dispute transactions made with their (fraudulently obtained) credit and check cards.

To summarize, the Court finds that the Government has proven, by a preponderance of the evidence, that the total loss attributable to Defendants' conduct is **$138,466.27**. This amount consists of:

- $51,500 in actual loss attributable to 103 financial transaction devices (each assessed a loss value of $500 under U.S.S.G. § 2B1 cmt. (n.3(F)(I)));

- $28,542.21 in actual loss reported by financial institutions and Anthony Demaree;

- $49,907.06 in intended loss from returned checks, returned deposits, and non-sufficient checks; and

- $8,517.00 in intended loss from disputed transaction claims.

Accordingly, the Court shall assess a 2-level enhancement to each Defendant's offense level for an amount of loss exceeding $120,000.00, pursuant to U.S.S.G. §2B1.1(b)(1)(F).

15

II.     The Court Shall Assess a 2-Level Enhancement for More Than 10 Victims:

The Government alleges that there are 10 or more victims of Defendants' conspiracy. Under the Guidelines, if the offense involved 10 or more victims, the Court is to increase a defendant's offense-level by 2 levels. U.S.S.G. § 2B1.1(b)(2)(A). The Guidelines define a victim as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1, cmt. n. 1.

As discussed above, the only victims of Defendants' conduct who suffered actual loss that the Government has established by a preponderance of the evidence are National City Bank, Charter One Bank, Bank of America, and Mr. Demaree. The Government, however, contends that it has submitted evidence of additional victims of Defendants' conduct.

First, the Government asserts that the intended recipients of all the stolen mail found in Defendants' apartment should be included among the victims of Defendants' conduct, pursuant to Application Note 4(C)(i) of U.S.S.G. § 2B1.1. Application Note 4(C)(i) provides, "In a case in which undelivered United States mail was taken. . . 'victim' means (I) any victim as defined in Application Note 1; or (II) any person who was the intended recipient, or addressee, of the undelivered United States mail."

The Court heard testimony from Lt. Shelide and Agent Gavin that there were piles of mail in Defendants' apartment that appeared to be addressed to individuals other than Defendants. Among the pieces of mail submitted to the Court as evidence, the Government provided at least four items of mail from the Social Security Administration (copies of Social Security cards) that were addressed to individuals other than Defendants. (Gov. Ex. 27). Similarly, the Government submitted a valid treasury check, addressed to a person named Jeudy Tuot, that was seized from

Defendants' apartment.  All of these mail items are addressed to individuals whose names are not associated with the numerous aliases of Defendants.  Additionally, they are addressed to various apartments within the same apartment complex located in Wixom, MI.

Second, the Government asserts that it has presented evidence of a number of individuals who's means of identification were used without authority.  The Government directs the Court to Application Note 4(E) of § 2B1.1, which states that "in a case involving means of identification 'victim' means. . . any individual whose means of identification was used unlawfully or without authority."  The Government provided Social Security cards, Michigan Driver's Licenses, and Michigan State Identification documents for seven different individuals who are not Defendants.  The Government has not provided evidence, however, to establish that Defendants actually used these means of identification.  The only individuals whose identifications were presented to Court and which were actually used to facilitate Defendants' unlawful activities are those of Anthony Demaree and Maria Babanina.

Nonetheless, the Government has established, by a preponderance of the evidence, that Defendants' offenses involved at least 10 victims who have suffered actual loss, have had their mail stolen, or whose identities were used unlawfully.  The ten victims that can supported by evidence are: National City Bank, Charter One Bank, Bank of America, Anthony Demaree, Maria Babanina, and the 5 individuals whose mail was taken by Defendants.  The Court therefore finds that Defendants' conduct had 10 or more victims and shall assess a 2-level enhancement under § 2B1.1(b)(2)(A).

III.     The Court Shall Assess a 2-Level Enhancement Because Defendants' Conduct Involved Sophisticated Means.

The Government concurs with the Probation Office's determination that the Court should assess a 2-level enhancement because Defendants' conduct involved sophisticated means, pursuant to U.S.S.G. 2B1.1(b)(10).

When determining whether a defendant's fraudulent conduct involved sophisticated means, the Court looks to the totality of a defendant's conduct, rather than the individual steps in the fraudulent scheme. *See United States v. Masters*, 216 Fed.Appx. 524, 526 (6th Cir.2007); *see also United States v. Tandon*, 111 F.3d 482, 49 (6th Cir.1997).

In viewing Defendants' scheme in its totality, the Court agrees that Defendants' conduct involved sophisticated means. Defendants used dozens of aliases to fraudulently open dozens of bank accounts over a span of approximately three years. (See Gov. Ex. 8). Defendants used these bank accounts to float funds, cash fraudulent checks, extract cash during delays between rejected deposits of the fraudulent checks, and fraudulently dispute purchases and ATM withdrawals. Defendants utilized a number of fraudulent identification documents to create these accounts, and even used the identities of two real people. *See e.g. U.S. v. Erwin*, 426 Fed.Appx. 425 (6th Cir.2011) ("[F]unneling of transactions through relatives in order to disguise the origin of funds is sufficient to support an enhancement for sophisticated means."); *see also U.S. v. Crosgrove*. 637 F.3d 646, 667 (6th Cir.2011) ("[T]he repeated use of fictitious identities can justify a sophisticated means enhancement, particularly when the identity is reinforced through other deceptive practices. . ."). Among these identification documents were state identification cards and international driver's licenses with Defendants' pictures but bearing their alias names. Furthermore, a forensic analysis of Defendants' computer equipment revealed the same photographs of Defendants that were used on a number of Defendants' fraudulent identification

documents. In addition, Defendants' status as illegal aliens and use of aliases allowed them to avoid detection by law enforcement.

Accordingly, the Court shall assess a 2-level enhancement to Defendants' offense levels because their conduct involved sophisticated means.

IV. The Court Shall Assess a 2-Level Enhancement for the Unauthorized Use of Identification.

In addition to a 2-level enhancement for conduct involving sophisticated means, the Government requests that this Court assess a 2-level enhancement for an offense involving the unauthorized use of identification to produce another means of identification.

Section 2B1.1(b)(11)(C)(i) of the Guidelines provides that if an offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification" then the defendant's offense level shall be increased by 2 levels. Application Note 9(C) provides examples of conduct that falls within the scope of §2B1.1(b)(11)(C)(i). The examples include:

> (I) A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.

> (II) A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully.

U.S.S.G. §2B1.1(b)(11)(C)(i), cmt. n. 9(C).

In this case, the evidence establishes, and the Defendants do not contest, that Defendant

used the identity of at least one individual, Mr. Demaree, to open a bank account in the name of Mr. Demaree. This conduct clearly falls within the scope of example (I) of Application note 9(C). Vysniauskas obtained Mr. Demaree's name and address (likely through stolen mail), created a fraudulent identification card bearing Mr. Demaree's name, and utilized this identification card to create a second form of identification – a Bank of America checking account number.

The Court therefore finds that a 2-level enhancement to Defendants' offense levels, pursuant to §2B1.1(b)(11)(C)(i), is warranted under the facts of this case. *See United States v. Williams*, 355 F.3d 893, 898 (6th Cir.2003) (upholding a district court's assessment of a 2-level enhancement for the use of a person's social security card to obtain a bank loan).

VI.    The Court Shall Assess a 2-Level Enhancement for Obstruction of Justice to Vysniauskas, But Not to Leichanka.

The Government also concurs with the Probation Office's application of a 2-level enhancement to Defendants' offense levels for obstruction of justice. Defendants object to an obstruction of justice enhancement because they contend that the Government has not met its burden of proving that Defendants obstructed justice by a preponderance of the evidence.

U.S.S.G. § 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

(A)    Defendants' False Statements to Police Officers:

The Government directs this Court to Application Note 4 of the Commentary to § 3C1.1, which enumerates examples of conduct that constitute obstruction of justice. One example set

forth in the Guidelines is "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1, cmt. n. 4(G).

The Government contends that Defendants' false identification information to police officers and continued efforts to thwart the disclosure of evidence support the assessment of a 2-level enhancement for obstruction of justice. At the time of arrest, neither defendant provided police officers with their true names and the correct address of their apartment, from which police officers eventually searched and recovered evidence.

Leichanka asserts that any misrepresentations made to police officers did not significantly obstruct or impede the police officers in their investigation. Leichanka directs the Court to *United States v. Obi*, 195 Fed.Appx. 335 (6th Cir.2006), in which the Sixth Circuit held that attempts to merely shift an investigation elsewhere are not sufficient to constitute obstruction of justice as described in Application Note 4(G). In that case, the Court stated, "The focus of the guideline is on whether defendant, by actively making material false statements (and not by a passive refusal to cooperate), succeeded in significantly impeding the investigation. Failed attempts to shift the investigative searchlight elsewhere are not covered by the guidelines." *Id.* at 339 (quoting *United States v. Williams*, 952 F.2d 1504, 1516 (6th Cir.1991)). The court continued:

> Thus, while obstruction covered by Note 4(g) does not require a showing that officers were ultimately led astray, it does require a showing that the defendant made a materially false statement to investigators and that the false statement significantly obstructed or impeded the investigation. In other words, simply lying to officers or attempting to lead them astray is not sufficient to justify an enhancement pursuant to Application 4(g).

*Id*.

The Government has not provided evidence to establish that, by a preponderance of the evidence, Defendants' misleading statements significantly impeded the police officers' investigation. In fact, officers became aware of Defendants' apartment a day after Defendants were arrested and entered the apartment in order to retrieve the abandoned child. At the evidentiary hearing, the Government did not provide evidence to establish that Defendants' misleading statements were more than just an attempt to lead the officers astray.

(B).    Vysniauskas's Attempts to Conceal Evidence:

Another example of conduct constituting obstruction under Applicatoin Note 4(G) is "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so. . . ." U.S.S.G. § 3C1.1, cmt. n. 4(d).

The Government asserts that Vysniauskas's phone conversation with his friend, Vytas, while being held at the Sterling Heights Police Department, falls within the conduct described in Application Note 4(d). During the conversation, Vysniauskas tells Vytas that there is "a lot of stuff in his apartment which will get him into more trouble" and to take "envelopes, money, watches, and 'her' jewelry" out of the apartment. (Gov. Ex. 6 at 2). Vysniauskas further states that he "does not want to leave any evidence." *Id*. He also tells Vytas that the police officers don't know about their apartment because he has provided police with an address to a different location. *Id*.

The Court finds that Vysniauskas's attempts to thwart the investigation, as depicted in that transcripts of the phone calls, are sufficient evidence to establish obstruction of justice on the part of Vysniauskas. While the evidence shows that Vysniauskas directed Vytas to remove evidence from the apartment, the Court agrees with Leichanka that there is no evidence that Leichanka knew of Vysniauskas's attempts to conceal the evidence in the apartment. The Government merely states that Vysniauskas and Leichanka were communicating between cells in Lithuanian. The substance of these communications between Vysniauskas and Leichanka, however, are unknown. To find that the discussions between Vysniauskas and Leichanka while at the Sterling Heights Police Department implicate Leichanka in Vysniauskas's attempts to thwart the police investigation would be speculation on the part of the Court. The evidence currently before the Court does not establish Leichanka's connection with Vysniauskas's attempts to conceal evidence or that Leichanka's conduct was a material hindrance to the official investigation.

Accordingly, the Court shall assess a 2-level enhancement for obstruction of justice to Vysniauskas's offense level. The Court declines to impose a similar enhancement to Leichanka.

V.     The Court Declines to Assess a 2-Level Enhancement to Vysniauskas for an Aggravating Role in the Conspiracy.

The Government alleges that Vysniauskas organized, managed, or controlled his co-Defendant, Leichanka, and seeks to impose a 2-level enhancement for his alleged aggravating role in the conspiracy, pursuant to U.S.S.G. §3B1.1(c). To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.

While the Government insists that Vysniauskas managed the criminal activity to which Defendants pleaded guilty, the Government has not provided any evidence of Vysniauskas's aggravating role. It is clear from the evidence presented to the Court that the majority of the fraudulent identities, bank accounts, and transactions can be attributed to Vysniaukus. This alone, however, is insufficient to establish an aggravating role. The Government provided no evidence that Vysniauskas directed, controlled, managed, or supervised the actions of Leichanka. Without more, the Court is not inclined to assess a 2-level enhancement for an aggravated role as to Vysniauskas.

CONCLUSION

For the reasons stated above, the Court HEREBY ORDERES that Defendant Vysniauskas's offense level is 23, and Defendant Leichanka's offense level is 21. The offense levels for Defendants under the Guidelines are calculated as follows:

**Total as to Dainius Vysniauskas:**

| | |
|---|---|
| Base Offense (§ 2B1.1(a)(1)(A) and (B)) | 7 |
| Amount of Loss $120,000 - $200,000 (§ 2B1.1(b)(1)(G)) | 10 |
| 10+ victims (§ 2B1.1(b)(2)(A)(1)) | 2 |
| Sophisticated means (§ 2B1.1(b)(9)(c)) | 2 |
| Unlawful production of identification (§ § 2B1.1(b)(10)(C)(i and ii) | 2 |
| Obstruction of justice (§3C1.1(A and B)) | 2 |
| Acceptance of Responsibility (§3E1.1(a)) | -2 |
| **Total Offense Level:** | **23** |

**Total as to Tatsiana Leichanka:**

| | |
|---|---|
| Base Offense (§ 2B1.1(a)(1)(A) and (B)) | 7 |
| Amount of Loss $120,000 - $200,000 (§ 2B1.1(b)(1)(G)) | 10 |
| 10+ victims (§ 2B1.1(b)(2)(A)(1)) | 2 |
| Sophisticated means (§ 2B1.1(b)(9)(c)) | 2 |
| Unlawful production of identification (§ § 2B1.1(b)(10)(C)(i and ii) | 2 |
| Acceptance of Responsibility (§3E1.1(a)) | -2 |
| **Total Offense Level:** | **21** |

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Court

Dated: November 9, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 9, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager